```
                    UNITED STATES DISTRICT COURT
                       DISTRICT OF NEW JERSEY
```

|  |  |
|---|---|
| WALLACE R. BARR, on behalf of himself and all others similarly situated, | HONORABLE JOSEPH E. IRENAS<br><br>CIVIL ACTION NO. 05-5056 (JEI) |
| Plaintiff, |  |
| v. | **OPINION** |
| HARRAH'S ENTERTAINMENT, INC., |  |
| Defendant. |  |

**APPEARANCES:**

BLANK, ROME, LLP
By:  Stephen M. Orlofsky
Woodland Falls Corporate Park
210 Lake Drive East
Suite 200
Cherry Hill, NJ  08002
     Counsel for Plaintiff


LATHAM & WATKINS, LLP
By:  Alan E. Kraus
     Rebecca Kramer Brown
     Lauren K. Podesta
One Newark Center
16th Floor
Newark, NJ 07101-3174
     Counsel for Defendant


**IRENAS**, Senior District Judge:

Plaintiff commenced this class action on October 21, 2005, alleging breach of contract.  The Court has jurisdiction over this case pursuant to 28 U.S.C. § 1332, and over the class members pursuant to 28 U.S.C. § 1332(d).

Plaintiff moves to certify class and to appoint himself as the lead plaintiff. For the reasons set forth below, the Motion will be granted.

## I.

Plaintiff ("Barr") was the former CEO of Caesars' Entertainment Inc. ("Caesars") until Defendant Harrah's Entertainment, Inc. ("HET") acquired Caesars. On July 14, 2004, Caesars entered into a merger agreement (the "Merger Agreement") with HET and Harrah's Operating Company ("HOC"), a wholly owned subsidiary of HET. (Pl. Ex. A). On March 11, 2005, Caesars' stockholders voted in favor of the Merger Agreement. (Pl. Ex. B). Caesars merged with and into HOC on June 13, 2005 (the "Merger").

Barr was a holder of options granted by Caesars to purchase its common stock. He asserts that he and other option holders were not paid for the full value of their options as provided by the terms of the plan pursuant to which the options were issued by Caesars when the payment for the options became due.

Pursuant to § 2.01 of the Merger Agreement, Ceasars' shareholders had the right to elect to receive either $17.75 (the "cash option") or up to 0.3247 of a share of HET common stock (the "exchange option") for each share of Caesars' common stock. The rate at which Caesars' common stock is converted into HET's common stock is the "Exchange Ratio," which was subject to a proration

2

schedule in § 2.01(e) of the Merger Agreement. Under the proration schedule, a higher percentage of Caesars' shareholders electing the exchange option leads to a smaller Exchange Ratio.

Ultimately, 97.35% of Caesars' shareholders elected the exchange option. Under the proration schedule, these shareholders would receive 0.2212 of a share of HET common stock plus $5.66 for each share of Caesars common stock. On June 13, 2005, the closing date of the Merger, HET stock traded at $73.17 per share. Accordingly, Caesars' shareholders who elected the exchange option received $21.85 per share for their stock.[1]

Section 2.04(c) of the Merger Agreement provided for the treatment of Caesars' Restricted Stock Units ("RSUs"). Caesars' 2004 Long Term Incentive Plan (the "2004 Plan") permitted RSU holders to receive Caesars' common stock or cash upon the vesting of their RSUs. (Pl. Ex. C). The 2004 Plan also states that RSUs would become vested upon a change in control.

Section 2.04(e) of the Merger Agreement provides for the treatment of Supplemental Retention Units ("SRUs"). The Supplemental Retention Plan (the "SRU Plan") adopted by Caesars' predecessor, Park Place Entertainment, Inc. ("PPE"), created these SRUs. (Pl. Ex. D). The SRU Plan permitted Caesars' senior executives to receive SRUs which were convertible into a share of

---

[1] This value is computed by multiplying the value of a HET share ($73.17) by the prorated Exchange Ratio (0.2212) and adding $5.66.

Caesars' common stock upon vesting. All unvested SRUs would become vested upon a change in control as defined in Article 2 of the SRU Plan. (*Id.*).

The Merger Agreement provided that the RSUs and SRUs would vest on the date of the Merger and be exchanged for HET common stock. The Merger Agreement also exempted these units from the proration schedule, and allowed them to be exchanged for HET common stock at the Exchange Ratio of 0.3247. Calculated this way, each RSU or SRU had a value of $23.76, based on the closing price of HET common stock at the time of the Merger.

In 1998, PPE adopted the Park Place Entertainment Corporation 1998 Stock Incentive Plan (the "1998 Plan"), which was amended in part as of May 11, 2001. (Pl. Ex. E). The 1998 Plan was designed to compensate Caesars' officers and employees through the award of stock options. Pursuant to the Merger Agreement, HET assumed Caesars' obligation under the 1998 Plan. (Pl. Ex. F, No. 1).

Section 5(j) of the 1998 Plan contained a "Change in Control Cash-Out" provision that provided each option holder with the right to elect to surrender their options in exchange for a cash payment during the 60-day period following a "change in control" event. (Pl. Ex. E). This section also provided that the cash payment was an amount equal to the number of shares of options multiplied by the difference between the Change in Control Price (the "CCP") on the date of the election and the exercise price.

Section 7(c) of the 1998 Plan defined the CCP as:

> (i) the highest reported sales price, regular way, of a share of [Caesars'] Common Stock in any transaction reported on the New York Stock Exchange Composite Tape or other national exchange on which such shares are listed or on NASDAQ during the 60-day period prior to and including the date of a Change in Control, or (ii) if the Change in Control is the result of a tender or exchange offer or a Corporate Transaction, the highest price per share of Common Stock paid in such tender or exchange offer of Corporate Transaction.

After the Merger, HET calculated the cash payment for the option holders by using $21.85 as the CCP. (Pl. Ex. G, No. 2). HET calculated the cash payment "by multiplying the [CCP] of $21.85 times the number of options held, minus the exercise price in the option awards times the number of options awarded." (*Id.*). HET calculated the CCP of $21.85 by multiplying the closing price of HET stock on June 13, 2005, ($73.17) by 0.2211 (prorated Exchange Ratio) and adding $5.66. (*Id.*).

This formula was applied to every person who elected to receive cash for their options. Accordingly, on March 14, 2005, all option holders who elected to exchange their options for cash received an initial $20.89 payment for each share of option. On June 24, 2005, following consummation of the Merger, all option holders received a top-off payment that was intended to result in a payment equivalent to the CCP as defined by the 1998 Plan. The top-off payment was an additional $0.96 per share based on the final 0.2212 Exchange Ratio. In total, all option holders received a cash out price of $21.85 per share.

Barr claims that HET breached the 1998 Plan because the option holders were not awarded "the highest price per share of Common Stock paid in such tender or exchange offer of Corporate Transaction. . ." (Pl. Ex. E, § 7(c)). He argues that since holders of RSUs and SRUs were paid shares of HET common stock having a value of $23.76 for each share of Caesars' common stock, into which each RSU or SRU was convertible, the "highest price per share" should be $23.76.[2] This claim is the basis for this litigation.

Caesars retained Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden") in connection with the Merger. On February 4, 2005, Skadden provided a memorandum (the "Skadden Memo") to Mark Clayton, in-house counsel for Caesars, addressing, *inter alia*, the Change in Control provisions of the 1998 Plan. (Df. Ex. 2). The Skadden Memo stated that the Merger may take over 90 days to close, which makes determining the CCP impossible in a timely fashion. It proposed that Caesars could make an initial payment based on the 60-day period prior to the Change in Control date and a later "top-off" payment, or disregard the portion of the

---

[2] HET claims that the 1998 Plan required the option holders to elect the cash out option within 60 days of shareholder approval of the Merger. Payment to any option holder who elected the cash out option must be made within 30 days after the election. HET argues that because more than 90 days elapsed between shareholder approval and the closing of the Merger, there was no "highest price" paid for the purpose of interpreting the 1998 Plan.

definition relating to the highest price paid in the Merger. (Df. Ex. 2, n.2).

Barr requested a copy of the Skadden Memo and received it on February 5, 2005. He did and said nothing in response to the Skadden Memo. Caesars adopted the "top-off" method. Caesars' Board discussed the mechanics of the "top-off" payment on May 10, 2005. Barr claims that he verbally objected to the calculation method at the meeting, but the minutes do not reflect this.

On May 9, 2005, Barr received from Josh Hirsberg in Caesars' Treasury Department a PowerPoint presentation describing the "top-off" process. The presentation included the following bullet point: "The price per share will be determined based on the mix of cash and stock received in the merger." (Df. Ex. 5).

Barr held 2,150,000 shares of options under the 1998 Plan. On or about June 18, 2005, he received a top-off payment of $2,064,000, reflecting a per-share price of $0.96. After receiving his top-off payment, Barr sent an email to Caesars stock administration on June 18, 2005, objecting to the top-off price:

> I do not agree with the proposed pricing and the approach to use the closing price for the closing day of the merger transaction. The '98 Plan calls for "the highest price paid" and I believe that to be the closing price times the .3247 factor for a share of HET stock that the stock grant (SRU's etc. etc.) holders received. In that transaction the holders of the CZR stock grants exchanged there [sic] stock grant right for a share of CZR common and then converted that common share into a share of common stock of HET at the .3247 factor or $23.76 . . . with a resultant Top Off of $2.87 per share and not 95 cents. . .

7

(Df. Ex. 8).

Barr emailed Hirsberg again on June 22, 2005, stating that he will sign a form so that the company can comply with the securities filing obligations, but he is doing so without prejudicing his claim that the top-off payment was incorrect. (Df. Ex. 9).

## II.

Fed. R. Civ. P. 23 creates a two-prong standard for class certification. Rule 23(a) sets forth the "threshold requirements for all class actions." *In re Mercedes-Benz Antitrust Litig.*, 213 F.R.D. 180, 183 (D.N.J. 2003). Rule 23(b) describes the three categories of maintainable class actions within the Rule. To succeed on his Motion, Barr must establish all four elements of Rule 23(a) and at least one of Rule 23(b). *See Chiang v. Veneman*, 385 F.3d 256, 264 (3d Cir. 2004).

The issue raised by a Rule 23 motion is whether a class action is an appropriate litigation vehicle, and not on the merits of the case. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974); *Chiang*, 385 F.3d at 269-70. However, in certain instances the Court may need "to analyze the elements of the parties' substantive claims and review facts revealed in discovery in order to evaluate whether the requirements of Rule 23 have been satisfied." *In re Ford Motor Co. Ignition Switch Prods. Liab.*

*Litig.*, 174 F.R.D. 332, 339 (D.N.J. 1997).

Rule 23(a)'s requirements are: "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class."

Rule 23(b)(3) requires that the "court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. . . ."

### III.

Barr seeks to certify a class defined as:

> All persons who held options granted pursuant to the 1998 Plan to purchase Caesars common stock and who exchanged their options as a result of the Merger, but who did not receive the equivalent of the highest price that was paid for the shares of Caesars' common stock in connection with the Merger. Excluded from the Class are HET, the officers and/or directors of HET, and members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which HET has or had a controlling interest.[3]

---

[3] The issue to be resolved by this case is whether the class members were paid "the highest price that was paid for the shares of Caesars' common stock in connection with the Merger." Barr's attempt to define the class through this issue creates a somewhat circular definition. The Court will modify the class definition in the Certification Order to read as follows:

9

(Pl. Br. at p. 9).  He claims that "the putative classes' claims are from the same course of conduct -- HET's failure to make the proper cash-out payment to option holders under the 1998 [Plan] -- and are based on the same legal theories -- breach of contract and specific performance."  (*Id.* at p. 1).

HET does not challenge that Barr's claim meets the requirements of numerosity, commonality, and Rule 23(b)(3).  HET only argues that Barr has failed to establish typicality and adequacy.

A.

"The typicality inquiry centers on whether the interests of the named plaintiffs align with the interests of the absent members."  *Stewart v. Abraham*, 275 F.3d 220, 227 (3d Cir. 2001).  "[F]actual differences will not render a claim atypical if the claim arises from the same event or practice or course of conduct that gives rise to the claims of the class members, and if it is based on the same legal theory."  *Baby Neal v. Casey*, 43 F.3d 48,

---

All persons who held options granted pursuant to the Park Place Entertainment Corporation 1998 Stock Incentive Plan to purchase Caesars common stock and who exchanged their options as a result of the merger among Caesars' Entertainment Inc., Harrah's Entertainment, Inc. ("HET"), and Harrah's Operating Company.  Excluded from the Class are HET, the officers and/or directors of HET, and members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which HET has or had a controlling interest.

58 (3d Cir. 1994). "[T]he threshold for satisfying the typicality prong is a low one." *Weisfeld v. Sun Chemical Corp.*, 210 F.R.D. 136, 140 (D.N.J. 2002). The typicality requirement is designed to ensure that the interests of the class and the representatives are aligned to assure that the absent class members' interests will be fairly represented. *Baby Neal*, 43 F.3d at 57.

A proposed representative "is neither typical nor adequate if the representative is subject to a unique defense that is likely to become a major focus of the litigation." *Beck v. Maximus, Inc.*, 457 F.3d 291, 301 (3d Cir. 2006). Defendant carries the burden to "show some degree of likelihood a unique defense will play a significant role at trial." *Id.* at 300. However, if the Court determines an asserted unique defense has no merit, the defense will not preclude class certification. *Id.*

Thus, to defeat class certification on the ground of unique defense, HET must demonstrate not only that Barr is subject to a defense unique to himself, but also that the defense "'could conceivably become the focus of the entire litigation. . .'" *Beck*, 457 F.3d at 301 (quoting *Zenith Laboratories, Inc. v. Carter-Wallace, Inc.*, 530 F.2d 508, 512 (3d Cir. 1976)).

HET claims that Barr is subject to unique defenses because he was the CEO of Caesars prior to the Merger, and was presumptively knowledgeable of the terms of the Change in Control provision of the 1998 Plan. HET argues that Barr was advised on multiple

11

occasions that Caesars intended to calculate the CCP for the 1998 Plan options based on the prorated Exchange Ratio, the method HET eventually used. Therefore, HET argues, that Barr's failure to make any vocal objections to the use of the prorated Exchange Ratio before HET made the top-off payments meant that he did not genuinely believe that the method was a breach of contract, and that he should be estopped from arguing otherwise now.

HET fails to sustain its burden of showing that Barr is subject to a unique defense that is likely to become a major focus of the litigation. First, the alleged "unique defense" is of questionable merit. Without legal analysis or citing authorities, HET claims that the fact that Barr did not believe that HET's using prorated Exchange Ratio was a breach of contract and therefore should be estopped from asserting his contractual claims now. It is unclear to the Court why this estoppel claim constitutes a defense to breach of contract.[4]

---

[4] HET made no effort to articulate the legal requirements for equitable estoppel. To establish a claim of equitable estoppel,

> the claiming party must show that the alleged conduct was done, or representation was made, intentionally or under such circumstances that it was both natural and probable that it would induce action. Further, the conduct must be relied on, and the relying party must act so as to change his or her position to his or her detriment.

*Phillips v. Borough of Keyport*, 107 F.3d 164, 182 (3d Cir. 1997) (*en banc*); *see also Miller v. Miller*, 97 N.J. 154, 163 (1984).

Even assuming Barr agreed at that time that the top-off

The facts here show that Barr was probably unaware of the top-off payment amount calculated by HET before the Merger. Barr testified that when Caesars' board discussed the issue of CCP, he and Steve Bollenbach opposed the method of calculation proposed by HET. (Barr Dep., at 69:21-70:3). The board did not vote on this issue because eight of the nine board members elected to exchange their options for cash. (*Id.* at 70:4-71:11). Due to this conflict, the Board delegated the decision to Steven Crown, the only member of the Board who had not elected to exchange his options for cash. (*Id.*).

Ultimately, Crown never made a decision and gave HET the sole

---

payment did not breach the 1998 Plan, HET still failed to show that Barr's agreement induced any action and that HET relied on Barr's agreement to its detriment. *See Philips*, 107 F.3d at 182. It can hardly be argued that Barr tried to induce HET to pay him and other option holders less than the amount to which they might be contractually entitled.

Similarly, HET has not stated a waiver defense. "A waiver, to be operative, must be supported by an agreement founded on a valuable consideration, or the act relied on as a waiver must be such as to estop a party from insisting on performance of the contract or forfeiture of the condition." *West Jersey Title & Guaranty Co. v. Industrial Trust Co.*, 27 N.J. 144, 152-53 (1958). In addition, a waiver requires "a clear, unequivocal, and decisive act of the party showing such a purpose or acts amounting to an estoppel on his part." *G.E. Capital Mortg. Servs., Inc. v. Marilao*, 352 N.J. Super. 274, 281 (App. Div. 2002).

Here, HET never offered any evidence that it furnished valuable consideration for a wavier from Barr. In addition, Barr's alleged silence with respect to HET's intended use of the prorated Exchange Ratio was not a "clear, unequivocal, and decisive act." *Marilao*, 352 N.J. Super. at 281. Therefore, HET has not stated a waiver defense under New Jersey law.

authority to decide how the CCP would be calculated. (Barr Dep., at 70:4-71:11). Barr claims that he learned with certainty, for the first time, the manner in which HET had calculated the CCP on June 18, 2005, when he received his top-off payment. Shortly thereafter, he sent two emails objecting to the amount.

Thus, HET's claim that Barr has waived his right to challenge the use of the prorated Exchange Ratio stands on weak factual support. Even if the Court assumes that Barr had knowledge of HET's intention to calculate the CCP based on the prorated Exchange Ratio, Barr testified that he verbally objected to the use of prorated Exchange Ratio during the board meeting. (*See* Barr Dep., at 69:21-70:3). HET offers no evidence to refute Barr's testimony, and relies only on the fact that the minutes of the board meeting does not reflect Barr's objection. Barr also testified that he did not know for certain which CCP HET used until he received the top-off payment. Thus, the record does not appear to support a waiver defense unique to Barr.

During oral argument, HET also argues that Barr's alleged inactions may undermine the merit of his claim. Specifically, HET argued that if the focus of litigation becomes the interpretation of the 1998 Plan, HET would call Barr as a witness and his testimony would give the triers of the fact a reason to believe that HET did not breach the 1998 Plan.

The Court also finds this argument unpersuasive. Even if

14

Barr's testimony undermines the claim for breach of contract, it would not be an unique defense but a defense common to the entire class.  If Barr's testimony would be helpful, HET could call him as a witness whether or not he is appointed the class representative.  Finally, nothing about the fact that Barr may be called to testify by HET creates a conflict of interest between Barr and the rest of the class.  Therefore, this fact does not undermine Barr's ability to represent the class.

Even if HET may rely on these defenses, it did not show that they will play a significant role in the class claim.  The focus of the class claim will be the interpretation of the 1998 Plan.  The defense against Barr is unlikely to become the major focus of the litigation.  *See*, *e.g.*, *Rendler v. Gambone Bros. Development Co.*, 182 F.R.D. 152, 158 (E.D. Pa. 1998) (holding that standing defense did not prevent class certification because it would not be a major part of the litigation).

HET has not shown how the purported unique defense "is likely to become a major focus of the litigation." *Beck*, 457 F.3d at 301.  Thus, it has failed to meet its burden to establish that Barr should be deemed an atypical and inadequate class representative.

### B.

The Third Circuit has adopted a two-prong test for

determining the adequacy of representation by the named plaintiff and his counsel: "(a) the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation, and (b) the plaintiff must not have interests antagonistic to those of the class." *Wetzel v. Liberty Mut. Ins. Co.*, 508 F.2d 239, 247 (3d Cir. 1975). "A party challenging the Class' representation has the burden to prove that the representation is not adequate." *Varacallo v. Massachusetts Mut. Life Ins. Co.*, 226 F.R.D. 207, 233 (D.N.J. 2005); *see also In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F. Supp. 450, 519 (D.N.J. 1997).

HET claims that Barr is an inadequate class representative because he is "incapable of articulating his own claim or of directing the activities of counsel on behalf of the class." (Df. Br. at pp. 15-16). HET cites Barr's deposition testimony, in which he repeatedly claim that the CCP should have been calculated based on the price paid for the SRUs, while ignored the RSUs:

> Q: So is it your testimony tody that the [CCP] should have been determined based upon the amount of Harrah's stock, the value of the Harrah's stock exchanged for [SRUs]?
>
> . . .
>
> A: Yes
>
> . . .
>
> Q: Is that the only price that should have been used for making the final top-off payment?

16

. . .

A:   That would be I believe my position, yes.

(Df. Ex. 1, at 104:10-105:6).

HET notes that the original Complaint states that the CCP should have been calculated based only on the amount paid in the Merger for RSUs and not SRUs. Barr's counsel amended the Complaint on February 7, 2007, and added the SRUs to its factual allegations.

In addition, HET claims that Barr testified that he believed that the SRUs converted into shares of Caesars' common stock before the close of the Merger and then were converted into HET shares. Barr subsequently admitted that this was not the mechanism through which SRU holders were paid. In fact, SRUs were merely units convertible into a share of Caesars' common stock, but they were never converted into shares of Caesars stocks during the Merger. Because the SRUs did not convert into stock shares, Barr was unable to articulate the legal theory as to the SRUs' relevance to the calculation of the CCP during deposition.

HET claims that Barr's mistakes about the factual allegations in the original Complaint and his inability to articulate the legal theory behind his claims render him inadequate as a class representative.

Rule 23(a)(4)'s requirement that a class representative "fairly and adequately protect the interests of the class" mainly

17

seeks "to uncover conflicts of interest between named parties and the class they seek to represent." *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 532 (3d Cir. 2004).  The plaintiff's attorney, on the other hand, "must be qualified, experienced, and generally able to conduct the proposed litigation. . ." *Wetzel*, 508 F.2d at 247.

A class representative need only possess "a minimal degree of knowledge necessary to meet the adequacy standard." *Szczubelek v. Cendant Mortgage Corp.*, 215 F.R.D. 107, 119 (D.N.J. 2003); *see also Zinberg v. Washington Bancorp., Inc.*, 138 F.R.D. 397, 408 (D.N.J. 1990); *Hoffman Elec., Inc. v. Emerson Elec. Co.*, 754 F. Supp. 1070, 1077 (W.D. Pa. 1991).  A proposed representative's lack of particularized knowledge concerning the dispute at issue "does not render her inadequate given the fact that she has retained adequate counsel to represent her." *Ettinger v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 122 F.R.D. 177, 182 (E.D. Pa. 1988); *see also Szczubelek*, 215 F.R.D. at 120.

The Court is not persuaded that Barr is an inadequate class representative.  HET does not argue that Barr has any conflict of interest with the class, or that Barr's counsel is inadequate.  HET has merely established that: (1) Barr did not remember or did not know a specific factual allegation in the original Complaint

during his deposition,[5] and (2) Barr did not know or could not articulate the legal theory behind his claims. The standard for the adequacy of the class representative is a low one, requiring only "a minimal degree of knowledge." *Szczubelek*, 215 F.R.D. at 119. Furthermore, a class representative need not be intimately familiar with the legal theory behind his claims since he is represented by adequate counsel. *Ettinger*, 122 F.R.D. at 182. Thus, HET failed to show that Barr is an inadequate class representative.

**IV.**

For reasons set forth above, the Court will grant the class certification motion and appoint Barr as the Lead Plaintiff and Barr's counsel as the Lead Counsel. The Court will issue an appropriate order.

Date: May 3, 2007

                                             s/*Joseph E. Irenas*
                                             JOSEPH E. IRENAS, S.U.S.D.J.

---

[5] The Court notes that acronyms "RSU" and "SRU" are susceptible to confusion.