UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

```
                              :
WALLACE R. BARR, on behalf of :
himself and all others        :
similarly situated,           :    HONORABLE JOSEPH E. IRENAS
                              :
          Plaintiff,          :   CIVIL ACTION NO. 05-5056 (JEI)
                              :
     v.                       :         OPINION
                              :
HARRAH'S ENTERTAINMENT, INC., :
                              :
          Defendant.          :
                              :
```

**APPEARANCES:**

BLANK ROME LLP
By:  Stephen M. Orlofsky, Esq.
     Evan H. Lechtman, Esq.
Woodland Falls Corporate Park
210 Lake Drive East, Suite 200
Cherry Hill, New Jersey 08002
     Counsel for Plaintiff

LATHAM & WATKINS LLP
By:  Alan E. Krause, Esq.
     Lauren K. Podesta, Esq.
One Newark Center, 16th Floor
Newark, New Jersey 07101-3174
     Counsel for Defendant


**IRENAS**, Senior District Judge:

Plaintiff commenced this class action against Defendant on October 21, 2005, alleging breach of contract and seeking specific performance.[1]  Before the Court are Defendant's motion

---

[1]  The Court granted Plaintiff's motion to certify the class on May 3, 2007.  *See Barr v. Harrah's Entertainment, Inc.*, 242 F.R.D. 287 (D.N.J. 2007).  The class was defined as, "All persons who held options granted pursuant to the Park Place Entertainment

for summary judgment and Plaintiff's cross-motion for summary
judgment.  (Docket Nos. 62 & 67).  The greater than $20 million
question presented by the parties is, fundamentally, what was the
"highest price per share of Common Stock paid [in a merger]"?
Such a seemingly simple question is complicated by the
intricacies of three stock-based incentive plans established
primarily for highly compensated employees, a cash-out provision
within the earliest of those plans, and a 2004 merger agreement.
Despite the relative complexity of the question, the Court finds
the plans and agreement unambiguous, and for the reasons set
forth below, Defendant's motion will be granted and Plaintiff's
cross-motion will be denied.


**I.**

This case involves a July 14, 2004 merger agreement (the
"Merger Agreement") between Defendant Harrah's Entertainment,
Inc. ("HET"), Harrah's Operating Company, Inc.,[2] and Caesars

_____

Corporation 1998 Stock Incentive Plan to purchase Caesars common
stock and who exchanged their options as a result of the merger
among Caesars Entertainment Inc., Harrah's Entertainment, Inc.
('HET'), and Harrah's Operating Company.  Excluded from the Class
are HET, the officers and/or directors of HET, and members of
their immediate families and their legal representatives, heirs,
successors or assigns, and any entity in which HET has or had a
controlling interest."  The Court appointed Wallace R. Barr as
the lead Plaintiff and Blank Rome LLP as the class counsel.

[2]  Harrah's Operating Company is a wholly owned subsidiary
of HET.

2

Entertainment, Inc. ("Caesars").[3]  Pursuant to the Merger
Agreement, HET acquired Caesars on June 13, 2005.  Plaintiff
Wallace Barr was the CEO of Caesars when the merger closed.
Since the dispute between the parties centers around the
interpretation of the PPE/Caesars 1998 Stock Incentive Plan (the
"1998 Plan"), the Court will begin its discussion of the facts
there.

**The 1998 Plan**

The 1998 Plan was adopted at the same time PPE was created.
It was based upon, and virtually identical to, a 1996 Hilton
Stock Incentive Plan.  (*Compare* Orlofsky Cert., Ex. 4, *with*
Orlofsky Cert., Ex. 6.)  Both plans authorized stock option
awards, which were intended to compensate officers and employees
who contributed to the management, growth, and profitability of
the companies.  (*Id.*, §§ 1, 4.)  At the time the plans were
adopted, neither Hilton nor PPE offered any other type of equity
awards.[4]  (Kraus Cert, Ex. 7, 21:23-22:7; Ex. 8, 27:24-28:19.)

_____

[3]  In a November 24, 1998 press release, Hilton Hotels
Corporation ("Hilton") announced the separation of its gaming and
lodging businesses via a tax-free distribution of its gaming
business.  (Orlofsky Cert., Ex. 1.)  As a result of the spin-off,
Hilton created the gaming company Park Place Entertainment
Corporation ("PPE").  (*Id.*)  PPE subsequently changed its name to
Caesars in January of 2004.  (*Id.*, Ex. 3.)  Because several of
the plans at issue in this case pre-date PPE's name change, the
Court will use PPE and Caesars interchangeably as necessary.

[4]  The 1998 Plan was amended on May 11, 2001.  The only
change to the 1998 Plan was that an additional 10 million stock
options were "reserved and available for grant under the Plan."

The 1998 Plan provided for accelerated vesting of stock options in the event of a "Change in Control," which was defined to include "[t]he approval by the stockholders of the Corporation of a reorganization, merger or consolidation or sale or other disposition of all or substantially all of the assets of the Corporation ('Corporate Transaction')."[5]  (Orlofsky Cert., Ex. 4, § 7(a), (b)(iii).)  Upon a Change in Control, all outstanding stock options became "fully exercisable and vested to the full extent of the original grant."  (*Id.*, § 7(a).)

In addition, pursuant to section 5(j) of the 1998 Plan, "during the 60-day period from and after a Change in Control (the 'Exercise Period') . . . an optionee [had] the right . . . to elect (within the Exercise Period) to surrender all or part of the Stock Option to the Corporation and to receive cash, within 30 days of such notice."  (*Id.*, § 5(j).)  Thus, any option holder who elected to receive cash was to be paid, at most, within 90 days after shareholder approval of a merger.  The amount of cash an option holder received would be determined by multiplying the total number of shares granted under the stock option by the difference between the "Change in Control Price" and the option grant's exercise price per share.  (*Id.*)

_____

(Orlofsky Cert., Ex. 4, § 3.)

    [5]  The "Corporation" was defined as "Park Place Entertainment Corporation, a Delaware corporation."  (Orlofsky Cert., Ex. 4, § 1(l).)

The Change in Control Price, the determination of which is critical to the resolution of this case, was defined as the higher of

> (i) the highest reported sales price, regular way, of a share of Common Stock in any transaction reported on the New York Stock Exchange Composite Tape or other national exchange on which such shares are listed or on NASDAQ during the 60-day period prior to and including the date of a Change in Control, or (ii) if the Change in Control is the result of a tender or exchange offer or a Corporate Transaction, *the highest price per share of Common Stock paid in such tender or exchange offer or Corporate Transaction.*

(*Id.,* § 7(c) (emphasis added).)[6]  The 1998 Plan defined "Common Stock" as "common stock, par value $.01 per share, of the Corporation."  (*Id.,* § 1(k).)

**The PPE Supplemental Retention Plan (the "2001 SRU Plan")**

PPE adopted the 2001 SRU Plan effective November 1, 2001. (Orlofsky Cert., Ex. 18, Art. 1.)  Its primary purpose was to provide "deferred compensation for a select group of management or highly compensated employees."  (*Id.* (internal quotation marks omitted).)  The 2001 SRU Plan was "intended to be a non-qualified retirement plan which [was] unfunded."  (*Id.; see also* Arts. 7.1,

---

[6]  In Plaintiff's statement of the facts, he introduces the deposition testimony of Hilton's former general counsel and PPE's former general counsel in an effort to elucidate the intent of section 7(c).  To the extent that either Plaintiff or Defendant utilize testimony or other extrinsic evidence to establish the intent of the drafters of any relevant documents in this case, the Court need not consider it.  That is because, as discussed *infra,* the Court finds the relevant provisions of such documents unambiguous, and therefore pursuant to Delaware law it does not need to look beyond their "four corners."

9.8.)

Pursuant to the 2001 SRU Plan, eligible employees would receive a certain number of "Rights" each year, as determined by PPE's CEO.  (*Id.*, Art. 4.2.)  A "Right," which the parties also refer to as an "SRU," was defined as "a right equivalent to one share of Company Stock," which was in turn defined as "shares of common stock of the Company that may be issued or transferred under the Plan."  (*Id.*, Art. 2.)  The 2001 SRU Plan required PPE to "create and maintain an unfunded Account on its books to reflect the number of Rights credited to each Participant . . . in any Plan Year."  (*Id.*, Art. 4.2.)  The value of an employee's account at a particular time was "determined as if those Rights were shares of Company Stock."  (*Id.*, Art. 4.4.)

A participating employee's entitlement to the SRUs credited to his account would vest incrementally over a four-year period. (*Id.*, Art. 5.1.)  If an employee ceased employment with PPE, any SRUs that had not fully vested after four years would terminate. (*Id.*, Art. 5.2.)  The 2001 SRU Plan made exceptions to the termination of SRUs if a participating employee died or became disabled or if there was a "Change of Control,"[7] as long as such an event occurred while the individual was still employed by PPE.

---

[7]  The 2001 SRU Plan defined a "Change of Control" to include the "consummation of a reorganization, merger or consolidation or sale or other disposition of all or substantially all of the assets of the Company ('Corporate Transaction')."  (Orlofsky Cert., Ex. 18, Art. 2.)

6

(*Id.*, Arts. 5.3, 5.4.)  In such instances, not only would the credited SRUs remain in effect, but they would also fully vest as of the date of the employee's death or disability or the Change of Control, regardless of the four-year vesting period.  (*Id.*) However, even when an employee's SRUs became fully vested, whether after four years or upon a Change of Control,[8] they were not distributed as shares of company stock until "the first day of the thirteenth month following the Participant's Retirement."[9] (*Id.*, Art. 6.2.)

The 2001 SRU Plan provided that the aggregate number of shares of Company Stock that could be issued or transferred was 2,500,000 shares.  (*Id.*, Art. 7.2.)  The shares that were available to be issued were "treasury shares that [had] been reacquired by the Company."  (*Id.*)  PPE's obligations under the 2001 SRU Plan could not be assigned or transferred "except to . . . any corporation or partnership into which [PPE] may be merged or consolidated."  (*Id.*, Art. 9.6.)  If PPE's board of directors determined that such a Change of Control was imminent, it was required to "cause [PPE] to create and fund a grantor trust of [PPE] that shall serve as the vehicle for paying all benefits due

---

[8]  If a participating employee died or became disabled, his SRUs would be distributed "as soon as administratively feasible" to his beneficiary. (Orlofsky Cert., Ex. 18, Art. 6.4.)

[9]  Unlike the 1998 Plan, an employee did not have the right to receive a cash payment under the 2001 SRU Plan.  (Orlofsky Cert., Ex. 18, Art. 6.1.)

under the Plan and the number of shares of Company Stock
contributed by [PPE] shall be that number of shares the Board
determines would then due [sic] if the Plan were to terminate and
all benefits were then to be paid in a single distribution."
(*Id.*, Art. 9.8.)  That same provision of the 2001 SRU Plan
provided that "[n]otwithstanding any segregation of assets or
transfer to a grantor trust . . . nothing contained herein shall
give any . . . Participant any rights to assets that are greater
than those of a general creditor of [PPE]."  (*Id.*)

**The Caesars 2004 Long Term Incentive Plan (the "2004 Plan")**

_____In March of 2004, PPE, now operating as Caesars, adopted the
2004 Plan.  It provided for the grant of various stock-based
awards as an incentive to directors, officers, employees, and
consultants of Caesars to continue with the company and to
increase their efforts on behalf of the company.  (Orlofsky
Cert., Ex. 9, § 1.)  The 2004 Plan was an unfunded plan and
stated that an award grantee "shall have no rights as a
stockholder with respect to any shares covered by the Award until
the date of the issuance of a stock certificate to him for such
shares."  (*Id.*, § 8(g), (h).)  The parties focus their attention
specifically on Restricted Stock Units ("RSUs") granted pursuant
to the 2004 Plan.

RSUs were defined as "a right granted to a Grantee under
Section 6(e) to receive Stock or cash at the end of a specified

deferral period, which right may be conditioned on the satisfaction of specified performance or other criteria." (*Id.*, § 2(x).)  The 2004 Plan defined "Stock" as "shares of the common stock, par value $0.01 per share, of [Caesars]." (*Id.*, § 2(aa).) It provided for the reservation of a maximum of 20 million shares of Stock for the grant of any awards.  (*Id.*, § 5.)  Under the 2004 Plan, the shares available to be issued could be "authorized but unissued shares or shares that shall have been reacquired by [Caesars, i.e., treasury shares]." (*Id.*)  Moreover, in the event that a merger affected the Stock such that there would be an adverse impact on any rights of Grantees, Caesars' Compensation Committee had the authority to "make such equitable changes or adjustments as it deem[ed] necessary or appropriate to . . . the number and kind of shares of Stock *or other property* (including cash) issued or issuable in respect of outstanding Awards." (*Id.* (emphasis added).)

RSUs were subject to vesting and forfeiture conditions. Often RSUs granted under a particular award would vest over a period of years.[10]  (*See* Orlofsky Cert., Ex. 13.)  However, in

---

[10]  For example, a grantee might receive a total of 80,000 RSUs pursuant to a particular RSU grant.  However, under the terms of the grant, only 20,000 RSUs would vest at the end of each subsequent year such that the grantee would be entitled to stock or cash for the full 80,000 RSUs after four years.

the event of a "Change in Control,"[11] any unvested RSUs became fully vested and any payment or forfeiture conditions lapsed. (*Id.*, Ex. 9, § 7.)  If a grantee's employment was terminated or if he failed to satisfy any conditions necessary to receive Stock or cash, all unvested RSUs were forfeited.  (*Id.*, § 6(e)(ii).) "Upon the vesting of the RSUs granted to the Grantee . . ., the Grantee [was] entitled to receive, as soon as practicable thereafter, a distribution of a number of shares of Stock that [was] equal in number to the aggregate number of vested RSUs then credited to the Grantee's account; <u>provided</u>, <u>however</u>, that [Caesars' Compensation Committee could] determine that all or any RSUs payable [could] be settled in cash."  (*Id.*, Ex. 13 (emphasis in original); *see also* Ex. 9, § 6(e)(i).)  If cash was paid, the amount had to be equal to the aggregate fair market value of the shares of Caesars common stock that would have been issued for the vested RSUs.  (*Id.*, Ex. 13.)

**The HET-Caesars Merger**

On July 14, 2004, HET and Caesars entered into the Merger Agreement pursuant to which HET agreed to acquire 100% of the issued and outstanding shares of Caesars common stock, and

---

[11]  Identical to the 2001 SRU Plan, the 2004 Plan defined a "Change in Control" to include "[t]he consummation of a reorganization, merger or consolidation or sale or other disposition of all or substantially all of the assets of [Caesars] ('Corporate Transaction')."  (Orlofsky Cert., Ex. 9, § 2(d)(iii).)

Caesars agreed to merge with and into Harrah's Operating Company.[12]  (Orlofsky Cert., Ex. 20, §§ 1.01, 2.01(c).)  Caesars also agreed that upon the closing of the merger all of its treasury stock would "no longer be outstanding and shall automatically be cancelled and retired and shall cease to exist." (*Id.*, § 2.01(b).)  In addition, "no cash, [HET] Common Stock or other consideration" was deliverable in exchange for such treasury stock.  (*Id.*)

Caesars' stockholders voted to approve the merger on March 11, 2005 (Orlofsky Cert., Ex. 21), which constituted a Change in Control under the 1998 Plan.  The merger closed on June 13, 2005 (Orlofsky Cert., Ex. 22), which was more than 90 days after stockholder approval, and thus was after the latest date by which 1998 Plan option holders who elected to receive cash for their options should have been paid.  The importance of this fact will become readily apparent below.

Section 2.01(c) of the Merger Agreement provided that each shareholder of Caesars common stock had the right to elect to receive either: (1) $17.75 in cash for each share; or (2) up to 0.3247 shares of HET common stock for each share of Caesars common stock (the "Exchange Ratio").  (Orlofsky Cert., Ex. 20, § 2.01(c).)  In order to provide HET with some economic certainty

---

[12]  HET was represented in connection with the merger by Latham & Watkins LLP ("Latham").  Caesars was represented by Skadden Arps Slate Meagher & Flom LLP ("Skadden").

regarding the merger, the Exchange Ratio was subject to proration if more than 66.42% of Caesars shares were tendered for HET common stock, as opposed to cash.  (*Id.*, § 2.01(e).)

By the time the merger prepared to close, approximately 97% of Caesars shares were tendered for HET common stock, rather than the $17.75 in cash per share.  The proration formula in section 2.01(e) of the Merger Agreement resulted in holders of Caesars common stock receiving 0.2212 shares of HET common stock and $5.66 in cash for each Caesars share tendered.  On the closing date of the merger, HET's stock price closed at $73.17. Accordingly, Caesars' shareholders who tendered their shares for HET common stock received a total consideration of $21.85 per share tendered ($73.17 multiplied by 0.2212, or HET shares having a value of $16.19, plus $5.66 in cash). (Orlofsky Cert., Ex. 24.)

Section 2.04 of the Merger Agreement dealt with Caesars equity awards.  There were three subsections of section 2.04 that covered the equity awards relevant to this case.  First, section 2.04(a) provided that Caesars stock options that were still outstanding at the closing of the merger (i.e., options that were not cashed out under section 5(j) of the 1998 Plan) would convert into HET options at the non-prorated Exchange Ratio.  (Orlofsky Cert., Ex. 20, § 2.04(a).)  Section 2.04(c) provided that each holder of RSUs would receive a number of shares of HET common stock "equal to the product of the number of shares of [Caesars]

12

Common Stock subject to RSUs credited to the holder's account . . . multiplied by the [non-prorated] Exchange Ratio."[13]  (*Id.*, § 2.04(c).)  Finally, section 2.04(e) stated that a participant in the 2001 SRU Plan would receive a number of shares of HET common stock "equal to the product of the number of shares of [Caesars] Common Stock subject to [SRUs] credited to such participant's account . . . multiplied by the [non-prorated] Exchange Ratio."[14] (*Id.*, § 2.04(e).)  Therefore, based on the $73.17 closing price of HET common stock at the consummation of the merger, holders of Caesars stock options, RSUs, and SRUs received a value of $23.76 per equity award unit ($73.17 multiplied by 0.3247).

**Determining the Change in Control Price Under the 1998 Plan**

In early 2005, prior to the March 11 shareholder vote on the merger, it became clear that Caesars might not be able to comply with the timing provisions of section 5(j) of the 1998 Plan. Again, pursuant to that section, upon shareholder approval of the merger, Caesars option holders who elected to receive cash for

---

[13]  The issuance of shares of HET common stock occurred after all unvested RSUs became fully vested at the closing of the merger (Orlofsky Cert., Ex. 20, § 2.04(c)), or, pursuant to the terms of the 2004 Plan, at the "consummation of" the merger (*Id.*, Ex. 9, § 2(d)(iii)).  At the same time, as stated previously, all Caesars treasury stock ceased to exist when the merger closed.

[14]  Participants in the 2001 SRU Plan received shares of HET common stock "as promptly as practicable" after the merger closed.  (Orlofsky Cert., Ex. 20, § 2.04(e).)  The Merger Agreement also required Caesars to "take all actions necessary to terminate the [2001 SRU Plan] as of the [closing of the merger]." (*Id.*)

their options should have been paid no later than 90 days after
such approval.  However, the Change in Control Price defined in
section 7(c), and specifically the "highest price per share of
Common Stock paid," could not be determined until the merger
closed, which was unlikely to occur until after the 90-day
period.  (Kraus Cert., Ex. 16, 210:19-212:12.)  In an attempt to
address this potential issue, Skadden provided Mark Clayton, an
in-house attorney for Caesars, with a memorandum on February 4,
2005.[15]  (*See* Orlofsky Cert, Ex. 25.)

Skadden's memorandum proposed two alternatives.  First,
Caesars could make an initial payment that relied on section
7(c)(i) of the 1998 Plan, which defined the Change in Control
Price as the highest market trading price for Caesars Common
Stock in the 60-day period *prior* to shareholder approval of the
merger.  (*Id.* at 2.)  Then if the highest price paid in
connection with the merger was "greater than the price used to
calculate the initial payment, a second 'top-up' payment would be
made to electing option holders at closing of the Merger or
shortly thereafter."  (*Id.*)  The second alternative was to simply
make one payment relying on section 7(c)(i) and to disregard
section 7(c)(ii) of the Change in Control Price definition.  (*Id.*

---

[15]  Upon receiving the memorandum from Skadden, Clayton
forwarded it via e-mail to Bernard DeLury, Caesars' General
Counsel.  (Kraus Cert., Ex. 18.)  DeLury then forwarded it to
Plaintiff via e-mail dated February 5.  (*Id.*)

at 2 n.2.)   Skadden recognized that while this second alternative would provide finality, it would probably not be the most beneficial alternative for option holders.  (*Id.*)  Therefore, Skadden recommended the first alternative's top-up payment after the closing. (*Id.* at 2.)  Caesars decided to adopt Skadden's proposed two payment approach, and it notified 1998 Plan option holders of the decision on March 2, 2005.[16]  (Orlofsky Cert., Ex. 26.)

Calculation of the Change in Control Price was addressed again in May of 2005, after shareholder approval of the merger, during a presentation to Caesars' board of directors.  That presentation stated that:

> (1) The Change in Control Cash-Out feature provides 1998 Plan participants the right to receive the Change in Control Price; (2) The Change in Control Price is the greater of $20.89 (previously paid) and the price per share paid in connection with the merger; (3) If the price per share paid in connection with the merger exceeds $20.89 a 'top-up' payment will be made; and (4) The price per share will be determined based on the mix of cash and stock received in the merger.

(Kraus Cert., Ex. 20.)  This fourth point made it clear that the price per share paid in connection with the merger would be based on the prorated Exchange Ratio used to compensate Caesars' shareholders who tendered their shares for HET common stock,

_____

[16]   All option holders who elected to receive cash for their options received an initial payment per share of $20.89 minus the exercise price per share designated in the option grant.  The $20.89 figure was the calculated Change in Control Price under section 7(c)(i) of the 1998 Plan.

rather than the non-prorated Exchange Ratio used to compensate RSU and SRU holders.  (Kraus Cert., Ex. 16, 290:8-291:17.)

Following the presentation, Stephen Bollenbach, the Chairman of the Board, and Plaintiff stated that they disagreed with the calculation of the top-up payment.  (Orlofsky Cert., Ex. 17, 45:24-46:22 and 53:16-54:10; Ex. 2, 69:11-25.)  Specifically, Plaintiff contended that payments to RSU and SRU holders that were based on the non-prorated Exchange Ratio would constitute the "highest price per share of Common Stock paid" in the merger, and should therefore serve as the Change in Control Price for calculating any top-up payment.  (*Id.*, Ex. 2, 75:24-76:9.)

As a result of the disagreement, Skadden advised that Caesars' Compensation Committee should review and consider the issue and that it should receive assistance from independent counsel.  (*Id.*, Ex. 15, 239:18-240:10 and 242:21-243:14.)  Based on Skadden's recommendation, the Compensation Committee retained the law firm of Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul Weiss").  (*Id.*, 245:12-24.)  Steven Crown, the only member of the Compensation Committee who had not elected to cash out his options, was the only member who did not recuse himself from considering the issue raised by Plaintiff and Bollenbach.  (*Id.*, 243:15-244:12; Ex. 11, 56:16-24.)

On June 10, 2005, a special meeting of Caesars' Compensation Committee was convened, with Crown serving as the only voting

16

member.  (*Id.*, Ex. 27.)  Even though Crown was the only voting
member, all committee members were present at the meeting.  (*Id.*)
Paul Weiss advised the Compensation Committee about different
approaches as to how the top-up payment could be calculated.
(*Id.*, Ex. 11, 66:3-18.)  Paul Weiss did not provide advice as to
which approach it thought was correct.  (*Id.*)  At the conclusion
of the special meeting, Crown elected not to take any action in
resolving the issue raised by Plaintiff and Bollenbach, instead
leaving the issue for HET to resolve.  (*Id.* at 66:21-68:23; Ex.
27.)  Crown testified at his deposition that his decision to take
no action was based in part on the Compensation Committee's
belief that it was inappropriate for only one member to resolve
the issue.  (*Id.*, Ex. 11, 69:14-17 and 82:17-83:1.)

    That same day, after the special meeting of the Compensation
Committee concluded, Paul Weiss advised Skadden that Crown took
no action.  At that point Skadden telephoned Michael Cohen, an
associate attorney at Latham, to inform him of the issue
concerning the manner in which the top-up payment should be
calculated.  (*Id.*, Ex. 28, 106:6-13.)  The phone call was the
first time that HET or its counsel (Latham) learned that an issue
regarding the top-up payment had arisen.  (*Id.*, 105:17-106:5.)
In an e-mail sent the evening of June 10, Cohen informed Skadden
that HET and Latham believed that the highest price per share
paid in connection with the merger should be based on the

17

prorated Exchange Ratio used to compensate Caesars'
stockholders.[17]  (Orlofsky Cert., Ex. 29.)  At some point between
June 10 and June 13, 2005, when the merger closed, Skadden
"communicated the fact that [its] interpretation of the plan was
the same as Latham's."  (Kraus Cert., Ex. 24, 106:19-107:8.)

**The Top-up Payment**

_____After the merger closed, it was determined that the Change
in Control Price pursuant to section 7(c)(ii) of the 1998 Plan
was $21.85, or the total prorated consideration paid per share to
Caesars' shareholders who tendered their shares for HET common
stock.  As compared to the initial payment previously made based
on the partial Change in Control Price of $20.89, that resulted
in a top-up payment of $0.96 per share to all Caesars option
holders who elected to receive cash for their options.  Prior to
the closing, Plaintiff received $28,594,353 as an initial payment
for his options under the 1998 Plan.  (Kraus Cert., Ex. 29,
Response 2.)  Shortly after the closing, Plaintiff received a
top-up payment of $2,064,000 for his options.  (_Id._)

      Holders of RSUs and SRUs were paid shares of HET common

---

[17]  It is true that, as Plaintiff notes in his statement of
the facts and HET concedes, HET had a self-interest in
determining what the top-up payment would be, as the decision
impacted HET by more than $20 million.  HET's CEO and Chairman of
the Board, Gary Loveman, reached the decision that the top-up
payment would be based on the prorated Exchange Ratio without
consideration by HET's full board of directors.  (Orlofsky Cert.,
Ex. 23, 154:8-13 and 155:8-156:25.)

stock without regard to proration, and thus they received 0.3247 shares of HET common stock for each vested RSU and SRU.  As established previously, the value received per equity award unit was $23.76.  According to Plaintiff, each class member should have received a top-up payment of $2.87 per share, which constitutes the difference between $23.76 and the partial Change in Control Price of $20.89.  (*See* Kraus Cert., Ex. 30.)  In other words, Plaintiff alleges that each class member is entitled to an additional $1.91 per share, over and above the top-up payment of $0.96 per share already received.

Defendant now moves for summary judgment, arguing that the top-up payment was properly calculated and that the class is not entitled to additional compensation for their cashed-out stock options.  Plaintiff cross moves for summary judgment, arguing that the top-up payment was improperly calculated and should have been based on the non-prorated Exchange Ratio used to compensate SRU and RSU holders.

## II.

"Under Rule 56(c), summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'"

19

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)).

In deciding a motion for summary judgment, the Court must construe the facts and inferences in a light most favorable to the nonmoving party. *Pollock v. Am. Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986). "'With respect to an issue on which the nonmoving party bears the burden of proof, the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case.'" *Conoshenti v. Pub. Serv. Elec. & Gas*, 364 F.3d 135, 145-46 (3d Cir. 2004) (quoting *Celotex*, 477 U.S. at 325). The role of the Court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The summary judgment standard is not affected when the parties file cross-motions for summary judgment. *See Appelmans v. City of Phila.*, 826 F.2d 214, 216 (3d Cir. 1987). Such motions "'are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist.'" *Transportes Ferreos de*

*Venez. II CA v. NKK Corp.*, 239 F.3d 555, 560 (3d Cir. 2001)
(quoting *Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d
Cir. 1968)).  If after review of cross-motions for summary
judgment the record reveals no genuine issues of material fact,
then judgment will be entered in favor of the deserving party in
light of the law and undisputed facts.  *Iberia Foods Corp. v.
Romeo*, 150 F.3d 298, 302 (3d Cir. 1998).

### III.

Both the 1998 Plan and the Merger Agreement provide that
Delaware law governs this case, without regard to conflict of
laws principles.  (*See* Orlofsky Cert., Ex. 4, § 10(g); Ex. 20,
§ 9.08.)  The proper construction of a contract is a question of
law.  *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*,
616 A.2d 1192, 1195 (Del. 1992).  Under Delaware law,

> Clear and unambiguous language in [a contract] should be
> given its ordinary and usual meaning. . . . When the
> language of [a] contract is clear and unequivocal, a
> party will be bound by its plain meaning because creating
> an ambiguity where none exists could, in effect, create
> a new contract with rights, liabilities and duties to
> which the parties had not assented.

*Id.* at 1195-96 (internal quotation marks omitted).

Mere disagreement between the parties as to a contract's
proper construction does not render it ambiguous.  *Id.* at 1196.
Rather, a contract is ambiguous only when the provisions in
controversy are reasonably susceptible to different

interpretations. *Id.*  "The true test is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant." *Id.; see also Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997) ("Contract terms themselves will be controlling when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language.").

In determining whether the language of a contract is susceptible to different interpretations, the Court has a "duty . . . to examine solely the language of the contractual provisions in question" and to confine itself "to the language of the document and not to look to extrinsic evidence to find ambiguity." *O'Brien v. Progressive N. Ins. Co.*, 785 A.2d 281, 289 (Del. 2001).  The Supreme Court of Delaware has held "unequivocally that extrinsic evidence is not to be used to interpret contract language where that language is plain and clear on its face." *Id.* (internal quotation marks omitted). Extrinsic evidence is relevant only when the contract language is ambiguous on its face.

Plaintiff's argument that the Change in Control Price under section 7(c)(ii) of the 1998 Plan should have been based on the non-prorated Exchange Ratio is premised on the assertion that "Common Stock" means not only issued and outstanding stock owned

22

by Caesars' shareholders, but also treasury stock reacquired by the company and stock that was authorized by the company but unissued.  This must be Plaintiff's threshold contention because the only Caesars shares available to be issued pursuant to the 2001 SRU Plan and the 2004 Plan were either treasury stock or stock that was authorized but unissued.  Unless Common Stock under the 1998 Plan is construed broadly to include all three forms of stock, Plaintiff's argument that the non-prorated Exchange Ratio used to compensate SRU and RSU holders was the "highest price per share of Common Stock paid" in connection with the merger necessarily fails.  The Court finds that Plaintiff's proposed meaning of Common Stock is refuted by the ordinary and usual meaning of that term as well as the clear and unequivocal language of the 1998 Plan.

The 1998 Plan's definition of Common Stock appears circular upon first glance, as it is defined as "common stock, par value $.01 per share, of the Corporation."  However, the definition's use of the very term being defined indicates to the Court that Common Stock should be given its ordinary and usual meaning.  If the parties intended the term Common Stock to mean something other than its ordinary and usual meaning, they would have provided a definition that encompassed more than simply "common stock . . . of the Corporation."  The Court would unnecessarily alter the terms of the 1998 Plan if it created an ambiguity in

such a basic definition by introducing conceptions of common stock outside of those ordinarily contemplated.

Delaware courts often look to dictionaries when trying to ascertain the plain meaning of contractual terms. *See Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 738 (Del. 2006).[18]  "This is because dictionaries are the customary reference source that a reasonable person in the position of a party to a contract would use to ascertain the ordinary meaning of words . . . in the contract."  *Id.*

*Webster's Third New International Dictionary* defines "common stock" as "capital stock of a corporation having one or more classes of preferred stock that enjoy a preference in dividend distributions."  WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (UNABRIDGED) 459 (1993).  It defines "capital stock," an important term in the definition of common stock, as "the outstanding shares of a joint stock company considered as an aggregate," or alternatively as "the ownership element of a corporation divided into shares and represented by certificates."  *Id.* at 332.  *Webster's* separately defines "treasury stock" as "issued stock reacquired by a

_____

[18]  The Court recognizes that the need to rely on dictionaries generally arises in those situations where a particular term is not defined at all in a contract.  *See Lorillard*, 903 A.2d at 738.  But here, where the term being defined is itself the operative part of the contractual definition, Delaware courts would likely find it proper to utilize dictionaries to assist in determining the ordinary and usual meaning of such a term.

corporation and held as an asset—compare *unissued stock*."  *Id.* at
2434.  The cross-referenced "unissued stock" is defined as "stock
authorized (as under the charter of a corporation) but not yet
issued."  *Id.* at 2500.

The *Webster's* definitions make clear that common stock is
ordinarily understood as being distinct from treasury stock and
stock that is authorized but unissued.  Common stock is "the
outstanding shares" of a company, and it "enjoy[s] a preference
in dividend distributions."  Treasury stock on the other hand,
while "issued," is no longer "outstanding" because it is
"reacquired by a corporation and held as an asset."  Because
treasury stock is not outstanding, it cannot enjoy a preference
in dividend distributions as can common stock.  This of course
makes sense since a corporation, which holds treasury stock,
would never distribute a dividend to itself.  Therefore, treasury
stock cannot be considered common stock.  In addition, *Webster's*
cross-references the definition of treasury stock, which is
issued but not outstanding, with that of unissued stock, which is
"authorized . . . but not yet issued."  While the Court is
probably stating the obvious, stock that is not yet issued cannot
be outstanding and would not enjoy a preference in dividend
distributions, and thus cannot be considered common stock.[19]

_____

[19]  *Black's Law Dictionary* also supports the conclusion that
common stock is considered distinct from treasury stock and stock
that is authorized but unissued.  It defines "common stock" as

This ordinary and usual meaning of common stock, which does not include treasury stock or authorized but unissued stock, is further supported by the clear language of the 1998 Plan.  For example, section 7(c)(i) of the 1998 Plan defines the first possible measure of the Change in Control Price as "the highest reported sales price . . . of a share of Common Stock in any transaction reported on the New York Stock Exchange Composite Tape or other national exchange on which such shares are listed." Only issued and outstanding shares of common stock, with their voting rights and rights to receive dividend distributions, are sold on national exchanges.  Unissued stock is certainly not sold on national exchanges.  It is only when such stock is designated as issued common stock that it can be sold publicly.

Treasury stock is issued stock that is reacquired by a company and is either canceled or held as an asset.  Again, it is issued but no longer outstanding stock.  If shares of treasury stock became outstanding again by way of a sale on national exchanges, they would, by definition, cease being treasury stock

---

"[a] class of stock entitling the holder to vote on corporate matters, to receive dividends after other claims and dividends have been paid . . . and to share in assets upon liquidation." BLACK'S LAW DICTIONARY 1456 (8th ed. 2004).  In contrast, "treasury stock" is defined as "[s]tock issued by a company but then reacquired and either canceled or held," and "unissued stock" is defined as "[s]tock that is authorized by the corporate charter but not yet distributed."  *Id.* at 1458.  As the terms are defined, treasury stock and unissued stock cannot share common stock's characteristics of rights to vote and receive dividends.

at that moment and would become common stock.  Thus, the language of section 7(c)(i) supports the conclusion that Common Stock under the 1998 Plan should not be construed broadly to include treasury stock and authorized but unissued stock.[20]  That term only includes issued and outstanding shares of Caesars stock owned by the company's shareholders, entitling them to any dividend distributions as well as voting rights.

Nonetheless, even if the Court accepts Plaintiff's

---

[20]  Plaintiff specifically points to the language of section 3 of the 1998 Plan to argue that the Court must interpret Common Stock broadly.  That section states that "[t]he total number of shares of Common Stock reserved and available for grant under the Plan shall be 55,000,000."  (Orlofsky Cert., Ex. 4, § 3.) Plaintiff states that it would have been impossible for Caesars to reserve 55,000,000 shares of Common Stock for future issuance if that term were limited to only issued and outstanding shares. That is because, according to him, issued and outstanding shares were not owned by Caesars but by common shareholders, and thus Caesars had no authority to reserve such shares for future award grants.  Plaintiff argues that the only "shares of Common stock" that could become "reserved" were treasury shares or authorized but unissued shares.

While the Court can appreciate the logic of Plaintiff's argument, that is not what a reasonable person in the position of the drafters would have thought that provision meant.  *Rhone-Poulenc*, 616 A.2d at 1196.  Any option award granted to a Caesars employee was not actually stock in any form at the time of such award, but rather a promise of an opportunity to purchase Caesars stock at a later date and a set exercise price.  For purposes of corporate planning and notice to already existing common shareholders, section 3 served to limit the number of shares of Common Stock that could become issued and outstanding pursuant to the 1998 Plan to an aggregate of 55,000,000.  In other words, section 3 was a forward-looking provision rather than an instant set-aside or reservation of a particular number of shares of Common Stock.  Thus, it is entirely consistent with the clear language of section 3 for the Court to interpret Common Stock to mean only issued and outstanding shares of Caesars stock.

contention that Common Stock should be read broadly, the plain language of the three equity award plans and the Merger Agreement do not support his argument that the Change in Control Price under section 7(c)(ii) of the 1998 Plan should have been based on the non-prorated Exchange Ratio.  Plaintiff's claim that the class is entitled to an additional $1.91 top-up payment per share is based on two alternative propositions.  The first is that section 7(c)(ii)'s language defining the Change in Control Price as the "highest price per share of Common Stock paid [in the merger]" provides evidence that the price could include payments for interests, i.e., SRUs and RSUs, that were valued "per share" of Caesars common stock.  The second is that even if the Court finds that the Change in Control Price is limited to only what was paid for an actual share of Caesars common stock, the payments to SRU and RSU holders constituted payments for the Caesars stock underlying those vested equity awards.  The Court will address each argument in turn.

Plaintiff's first proposition is, at best, a strained interpretation of the plain language of section 7(c)(ii).  A reasonable person in the position of the drafters of the 1998 Plan would probably not have thought that the Change in Control Price could include payments for other equity award interests because no such equity awards existed when the 1998 Plan was created.  The only equity awards available to PPE/Caesars

28

employees in 1998 were the possible stock option grants created by the 1998 Plan itself.  When the 1998 Plan was drafted there was no basis for a belief that the Change in Control Price could include payments for anything other than an actual share of Caesars common stock.

The Court recognizes that the parties could have drafted section 7(c)(ii) to encompass payments for interests that were created after 1998.  But as Plaintiff correctly states, though for the opposite conclusion, "[e]qually as significant is what Section 7(c)(ii) does not say."  (Pl's. Br. at 30.)  The section simply says highest price per share of Common Stock paid. Section 7(c)(ii) does not say, for example, "highest price per share of Common Stock, or per unit of any future equity awards valued as Common Stock, paid," which might provide evidence that the Change in Control Price contemplated more than payments for actual shares of Caesars common stock.  The Court must limit itself to the plain and ordinary meaning of that section, which is that the Change in Control Price only included payments for actual shares of Caesars common stock.  To find that section 7(c)(ii) contemplated anything more would unnecessarily introduce ambiguity to a provision that is clear on its face.

Plaintiff's alternative contention that payments to SRU and RSU holders constituted payments for the Caesars stock underlying those vested equity awards fails for two principal reasons.

First, the plain language of the 2001 SRU Plan and the 2004 Plan indicate that there were no shares of Caesars stock "underlying" vested SRU and RSU awards.  Though both plans clearly stated that they were unfunded, Plaintiff claims that the value of SRU and RSU awards were "inextricably linked" to shares of Caesars common stock.  However, merely using shares of common stock as a means of assigning value to alternative equity awards is not the same as having that share of common stock underlie the equity awards.  Pursuant to the 2001 SRU Plan, even fully vested SRUs were not distributed as shares of Caesars common stock until one full year after an employee's retirement.  Until such a distribution of shares occurred, SRUs were nothing more than an unfunded right equivalent to a share of Caesars common stock.  There were no shares of Caesars stock "underlying" vested SRUs.

The 2004 Plan was just as clear.  While RSUs were also valued as if they were shares of Caesars common stock, the 2004 Plan permitted the issuance of *either* stock or cash upon the vesting of RSUs.  Furthermore, the 2004 Plan stated that an award grantee had no rights as a stockholder until the date on which a stock certificate was issued for any shares of common stock, i.e., the date on which a choice between the issuance of cash or stock was made.  The combination of these two facts, as well as the unfunded status of the plan, inevitably lead to the conclusion that there were no shares of Caesars stock

"underlying" vested RSUs either.

Plaintiff's argument is also unavailing because the procedural mechanics of the merger did not permit Caesars common stock to underlie vested SRU and RSU awards before award holders received HET shares at the non-prorated Exchange Ratio. Plaintiff claims that, pursuant to section 9.8 of the 2001 SRU Plan, when the merger became imminent, Caesars should have created a grantor trust and contributed shares of Caesars treasury stock to pay all vested SRU awards. However, under the terms of the Merger Agreement, two things occurred on or by the consummation of the merger on June 13, 2005. First, pursuant to section 2.01(b), all shares of treasury stock ceased to exist when the merger closed and no consideration was deliverable in exchange for such shares. Second, section 2.04(e) required Caesars to terminate the 2001 SRU Plan as of the closing of the merger. Thus, at the time the merger closed there could not be an existing grantor trust or any shares of Caesars stock underlying vested SRUs. SRU holders were only entitled to shares of HET common stock at the non-prorated Exchange Ratio.

As for the 2004 Plan, section 5 allowed Caesars' Compensation Committee to make adjustments it deemed necessary to the type of property issuable for vested RSUs in the event of a merger. This discretion was critical given the terms of the Merger Agreement because, again, all shares of Caesars treasury

31

stock were canceled at the closing of the merger.  Moreover,
under section 7 of the 2004 Plan unvested RSUs only became vested
at the consummation, or closing, of a merger.  Therefore, on the
same date that all RSUs became vested, any issued Caesars stock
available to compensate RSU holders ceased to exist.  As a
result, Caesars had to permit holders of vested RSUs to receive
shares of HET common stock at the non-prorated Exchange Ratio
under section 2.04(c) of the Merger Agreement; but there could
not be any shares of Caesars stock underlying the RSU awards.[21]

--------

[21]  Before concluding, the Court finds it beneficial to
consider how the signing of the merger agreement on July 14,
2004, impacted each of the Caesars groups at issue in this case,
i.e., SRU/RSU holders, common stockholders, and stock option
holders under the 1998 Plan which included Plaintiff.  SRU/RSU
holders knew that they would receive shares of HET common stock
at the non-prorated Exchange Ratio for their vested SRUs and
RSUs.  However, they were subject to the greatest level of risk
because there was no floor on the value they might receive when
the merger was consummated and they had no protection by way of a
cash-out option.  While SRU/RSU holders eventually received the
greatest value for their equity awards, they were completely
subject to the vagaries of the market for an 11-month period
between the signing of the merger agreement and the closing of
the merger, when they received the shares of HET common stock.
     Caesars common stockholders occupied what might be
considered a middle position of risk.  Under the terms of the
merger agreement, they knew that they could receive shares of HET
common stock up to a particular Exchange Ratio, though that ratio
was subject to proration.  While this proration had the potential
effect of decreasing the value stockholders could receive for
their Caesars shares, they were protected by the $17.75 floor
provided in the agreement.  Thus, no matter how poorly the market
responded to the pending merger, at the time the merger was
consummated Caesars common stockholders knew they would still
receive $17.75 in cash per share.
     Plaintiff and the stock option holders under the 1998 Plan
had the benefits of both groups, with virtually no risk.  First,
the merger agreement provided stock option holders with the

Accordingly, the class is not entitled to an additional $1.91 top-up payment per share.  The highest price per share of Common Stock paid in connection with the merger was correctly based on the prorated Exchange Ratio and was the amount paid to Caesars' common shareholders who tendered their shares for HET common stock.

## IV.

For the reasons set forth above, the Court will grant Defendant's motion for summary judgment and will deny Plaintiff's cross-motion for summary judgment.  The Court will issue an appropriate Order.

Dated: May 29, 2008

s/ Joseph E. Irenas
**JOSEPH E. IRENAS, S.U.S.D.J.**

---

choice to hold their options until the consummation of the merger, at which time they would receive HET stock options at the non-prorated Exchange Ratio.  But unlike SRU/RSU holders, stock option holders were not compelled to take this route; they had complete control to choose.  If they elected not to receive HET stock options, as Plaintiff did, they were able to cash out their Caesars options and receive the same value that Caesars common stockholders received, with the identical protection of a $17.75 floor.  Therefore, the Court finds it somewhat disingenuous for Plaintiff to now assert, with perfect hindsight, that the class is entitled to a top-up payment per share because their choice did not prove to be the most profitable.