NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 08-2646

———

WALLACE R. BARR,
on behalf of himself and all
others similarly situated,
Appellant

v.

HARRAH'S ENTERTAINMENT, INC.

———

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil No. 1-05-cv-05056)
District Judge: Hon. Joseph E. Irenas

———

Submitted Under Third Circuit LAR 34.1(a)
July 6, 2009

Before: SLOVITER, AMBRO, and JORDAN, Circuit Judges

(Filed: July 7, 2009)

———

OPINION

SLOVITER, Circuit Judge.

Appellant Wallace Barr brought this class action on behalf of himself and certain other former officers, directors, and employees of Caesars Entertainment, Inc. ("Caesars") against appellee Harrah's Entertainment, Inc. ("Harrah's"), alleging breach of contract and seeking specific performance. After Caesars and Harrah's entered into a merger agreement in 2004, Barr and the remaining class members elected to cash out their stock options in Caesars. According to Barr, the class is entitled to over $20 million because the cash-out price was inadequate. The District Court, however, granted summary judgment to Harrah's, concluding that, under the clear terms of the applicable agreements, the class members received all to which they were entitled.

I.

This case primarily turns on the interpretation of Caesars' 1998 Stock Incentive Plan (the "1998 Plan").[1] The 1998 Plan was adopted when Caesars was spun off from Hilton Hotels Corporation and was based upon a similar plan adopted by Hilton in 1996. As summarized by the District Court, "[b]oth plans authorized stock option awards, which were intended to compensate officers and employees who contributed to the management, growth, and profitability of the companies." *Barr v. Harrah's Entm't, Inc.*, 555 F. Supp. 2d 484, 486 (D.N.J. 2008). At the time it adopted the 1998 Plan, Caesars

---

[1] At the time that the 1998 Plan was adopted, Caesars was known as Park Place Entertainment Corporation. We simply refer to this entity as Caesars.

did not offer any equity awards other than stock options.

The 1998 Plan provided that all outstanding stock options would vest upon a "Change in Control," which was defined to include "approval by the shareholders . . . of a . . . merger." App. at 335. Further, upon a Change in Control, the option holders could elect to "cash out" their options. Under section 7(c) of the 1998 Plan, an option holder who elected to cash out his or her options would receive "the higher of (i) the highest reported sales price . . . of a share of Common Stock in any transaction reported on the New York Stock Exchange Composite Tape or other national exchange . . . during the 60-day period prior to and including the date of a Change in Control or (ii) if the Change in Control is the result of a tender or exchange offer or a Corporate Transaction, the *highest price per share of Common Stock paid in such tender . . . .*" App. at 335-36 (emphasis added). "Common Stock" is defined in the 1998 Plan as "common stock, par value $.01 per share, of [Caesars]." App. at 324.

Two later employee compensation plans are also relevant. First, in November 2001, Caesars adopted a Supplemental Retention Plan (the "2001 Plan"). Pursuant to that plan, eligible Caesars employees received a certain number of "Rights" or "SRUs" each year as determined by Caesars' CEO. A "right" was defined as "a right equivalent to one share of Company Stock," App. at 402, and the value of an employee's SRU account was

3

to be determined "as if those Rights were shares of Company Stock," App. at 404.[2] An employee was entitled to receive a share of Caesars stock for each vested SRU on the first day of the thirteenth month following retirement. The 2001 Plan was unfunded. Finally, upon a "Change in Control," defined as relevant here as the "consummation" of a merger, App. at 400, any SRU that had not previously fully vested did so.

Second, in March 2004, Caesars adopted the Long Term Incentive Plan (the "2004 Plan"). That plan provided for a variety of stock-based awards for directors, officers, employees, and consultants. As relevant here, participants in the 2004 Plan received Restricted Stock Units ("RSUs"), which were defined as "a right . . . to receive Stock or cash at the end of a specified deferral period, which right may be conditioned on the satisfaction of specified performance or other criteria." App. at 418. Like the 2001 Plan, the 2004 Plan was unfunded and all RSUs fully vested upon the consummation of a merger.

In July 2004, Caesars and Harrah's entered into a merger agreement pursuant to which Harrah's would acquire all of Caesars' common stock and Caesars would merge into a subsidiary of Harrah's. Caesars' shareholders approved the merger in March 2005, an event which constituted a Change of Control under the 1998 Plan. Under the merger agreement, Caesars' shareholders were entitled to elect to receive either (1) $17.75 in

---

[2] "Company Stock" was defined as "the shares of common stock of [Caesars] that may be issued or transferred under the [Supplemental Retention] Plan." App. at 401.

cash per share or (2) up to .3247 shares of Harrah's stock for each share of Caesars' stock. Under the second option, the exchange ratio was prorated based on the number of Caesars' shareholders who elected to receive Harrah's stock rather than cash. Ultimately, about ninety-seven percent of Caesars' shareholders elected to receive Harrah's stock; under the terms of the merger agreement, they were therefore entitled to .2212 shares of Harrah's stock plus $5.66 in cash per share of Caesars' stock. Because Harrah's stock closed at $73.17 on the date of the merger, the value per share received by Caesars' shareholders was $21.85.

The merger agreement also included provisions dealing with the equity awards provided by Caesars to its management and employees. Individuals who held stock options under the 1998 Plan, but elected not to cash out their options, had their options converted into options for Harrah's stock at the non-prorated exchange ratio of .3247. Similarly, individuals who held SRUs under the 2001 Plan and/or RSUs under the 2004 Plan had their SRUs and/or RSUs converted into shares of Harrah's stock at the non-prorated exchange ratio of .3247. Thus, based on the closing price of Harrah's stock at the consummation of the merger, holders of Caesars stock options, SRUs, and RSUs received $23.76 per equity award unit, or $1.91 more per unit than Caesars shareholders received per share of stock.

The central issue in this case is whether the "highest price per share of Common Stock," i.e., the amount to which the Caesars option holders who cashed out their options

are entitled under the 1998 Plan, is the $21.85 received by Caesars' shareholders or the $23.76 received by holders of SRUs and RSUs. After much deliberation between Caesars, Harrah's, and their lawyers, Harrah's ultimately determined that the Caesars stock option holders who cashed out their options were entitled to $21.85 per option and paid them that amount.[3]

Barr then brought this class action, alleging breach of contract and seeking specific performance. Barr contends that the Caesars stock option holders who cashed out their options at the time of the merger are entitled to an additional $1.91 per option because the "highest price per share" of Caesar's stock was the $23.76 received per SRU and RSU. The District Court certified the class in May 2007. *See Barr v. Harrah's Entm't, Inc.*, 242 F.R.D. 287 (D.N.J. 2007). After the parties filed cross-motions for summary judgment, the District Court held that the class members were entitled only to the $21.85 per option they had already received.

In doing so, it rejected all of Barr's contentions. First, Barr argued that the term "Common Stock" as defined in the 1998 Plan included not only issued and outstanding stock owned by Caesars' shareholders, but also treasury stock owned by Caesars and authorized but unissued stock. As summarized by the District Court: "This must be

---

[3] Because of certain timing issues, the Caesars option holders received the $21.85 in two payments – an initial payment of $20.89 and a later payment of $0.96 per option. Barr received over $30 million for his Caesars options.

6

[Barr's] threshold contention because the only Caesars shares available to be issued pursuant to the 2001 SRU Plan and the 2004 Plan were either treasury stock or stock that was authorized but unissued." *Barr*, 555 F. Supp. 2d at 494. The Court concluded that Barr's proposed meaning of "Common Stock is refuted by the ordinary and usual meaning of that term as well as the clear and unequivocal language of the 1998 Plan." *Id.*

Further, the Court concluded that, even if "Common Stock" referred to shares other than issued and outstanding shares held by the shareholders, the term "highest price per share of Common Stock" in section 7(c)(ii) still could not refer to other equity interests such as SRUs and RSUs, which did not exist at the time the 1998 Plan was adopted and were therefore outside the contemplation of the parties to that Plan. Finally, the Court rejected Barr's argument that the payments made to the holders of SRUs and RSUs "constituted payments for the Caesars stock underlying those vested equity awards" because, as the Court stated, "there were no shares of Caesars stock 'underlying' vested SRU and RSU awards." *Id.* at 497.[4]

## II.

Caesars contends that the District Court erred in concluding that the "highest price

---

[4] The District Court had jurisdiction pursuant to 28 U.S.C. § 1332. We have jurisdiction under 28 U.S.C. § 1291. "We exercise plenary review over a district court's decision resolving cross motions for summary judgment." *Brentwood Med. Assocs. v. United Mine Workers of Am.*, 396 F.3d 237, 240 (3d Cir. 2005).

7

per share of Common Stock" was the value paid to Caesars shareholders ($21.85), rather than the value paid to holders of SRUs and RSUs ($23.76).

We need not decide whether, as Caesars argues, the District Court erred in concluding that the term "Common Stock" in the 1998 Plan referred only to issued and outstanding shares held by Caesars shareholders. Even if "Common Stock" is construed broadly, "the plain language of the [1998, 2001, and 2004 Plans] and the Merger Agreement do not support [Barr's] argument that the Change in Control Price under section 7(c)(ii) of the 1998 Plan should have been based on the non-prorated Exchange Ratio" applicable to SRUs and RSUs. *Id.* at 496.[5] Simply put, equity awards provided to a corporation's management are distinct from shares of common stock, and therefore the "highest price per share of Common Stock" does not encompass the value that holders of SRUs and RSUs received for those interests.

Barr counters that the use of "per share" in section 7(c)(ii) implies that "the Change in Control Price is not limited to payments for shares of Caesars Common Stock,

---

[5] Because we believe that the plain terms of the applicable agreements are clear and unambiguous, we need not consider the extrinsic evidence Barr tendered regarding the meaning of the 1998 Plan. *See Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195-96 (Del. 1992). In any event, we believe that Barr's extrinsic evidence does not support his interpretation of the 1998 Plan. For example, the testimony from Caesars' officers that individuals with options under the 1998 Plan would not be prejudiced by a merger and would receive the best possible deal for their options does not suggest that such option holders were entitled to receive more than Caesars shareholders.

8

but can also include payments for other equity awards that were valued 'per share' of Caesars common stock, such as RSUs and SRUs." Appellant's Br. at 49. However, we believe that a reasonable person in the position of the parties to the 1998 Plan would not have thought "per share" provided any guidance on this question. It simply clarifies that price is to be calculated on a unit, rather than aggregate, basis.[6]

Alternatively, Barr argues that the value that holders of SRUs and RSUs received was actually compensation for Caesars stock underlying those equity awards. However, both the 2001 Plan (SRUs) and the 2004 Plan (RSUs) were unfunded. Moreover, as the District Court correctly concluded, "merely using shares of common stock as a means of assigning value to alternative equity awards is not the same as having that share of common stock underlie the equity awards." *Id.* at 497. Indeed, under the terms of the 2001 and 2004 Plans, holders of vested SRUs and/or RSUs did not possess an absolute right to receive Caesars stock, at least where, as here, Caesars was merging with another entity.

---

[6] Barr contends that the District Court applied the wrong legal standard because it referred to a "reasonable person in the position of the *drafters* of the 1998 Plan." *Barr*, 555 F. Supp. 2d at 496 (emphasis added). However, earlier in its discussion the District Court correctly identified the governing rule of Delaware contract law, *see id.* at 493, and in any case we believe that a reasonable person in the position of the parties to the 1998 Plan would not have interpreted section 7(c)(ii) to mean that Caesars stock option holders were entitled to cash out their options for an amount greater than that received by the shareholders of Caesars common stock.

9

In summary, we agree with the District Court that the "highest price per share of Common Stock" within the meaning of section 7(c)(ii) of the 1998 Plan means the highest value paid to actual shareholders of Caesars stock under the merger agreement with Harrah's, not the value paid to individuals holding other types of equity interests.

## III.

For the above-stated reasons, we will affirm the judgment of the District Court.

_____